STATE OF NORTH CAROLINA v. BILLY JOE CRUZ

No. COA04-1217

(Filed 18 October 2005)

**1. Motor Vehicles— driving while impaired—motion to dismiss— corpus delicti rule—confession—corroborating evidence**

The trial court did not err by denying defendant's motion to dismiss the charge of driving while impaired, because evaluating the evidence under either the traditional or trustworthiness approach to the corpus delicti rule reveals that: (1) the State offered corroborating evidence of the essential facts of defendant's confession through the testimony of various witnesses; and (2) several officers and witnesses testified to defendant's drinking and impairment.

## 2. Motor Vehicles— driving while license revoked—motion to dismiss

The trial court erred by denying defendant's motion to dismiss the charge of driving while license revoked, because although the evidence supporting defendant's driving was sufficient, there was insufficient evidence that defendant knew his license was revoked when there was no evidence that an official notice was actually mailed to defendant's address as required by N.C.G.S. § 20-48.

## 3. Sentencing— aggravating factor—failure to submit to jury—*Blakely* error

The trial court committed *Blakely* error in a driving while impaired case by sentencing defendant as a Level II offender on the basis of its finding of the grossly aggravating factor that defendant drove impaired with a child under the age of sixteen in the car, and the case is remanded for resentencing, because the aggravating factor was not submitted to a jury to be determined beyond a reasonable doubt.

Appeal by defendant from judgment entered 12 February 2004 by Judge Thomas D. Haigwood in Pitt County Superior Court. Heard in the Court of Appeals 18 May 2005.

*Attorney General Roy Cooper, by Assistant Attorney General Patricia A. Duffy, for the State.*

*William D. Spence, for defendant-appellant.*

ELMORE, Judge.

Billy Joe Cruz (defendant) was indicted for involuntary manslaughter, driving while impaired, driving while license revoked, and aiding and abetting a person under twenty-one to possess alcohol. Following the State's evidence, the trial court dismissed the charge of involuntary manslaughter and the jury found defendant guilty of driving while impaired and driving while license revoked. Defendant appeals his convictions for these offenses on the basis that the trial court erred in denying his motion to dismiss.

Defendant's charges arose from the investigation of his nephew's death that occurred on 31 December 2002. Lee Cruz, defendant's underage nephew, had been drinking beer most of the day at defendant's house with other family members. During the early evening

hours Lee got a phone call from his girlfriend that prompted him to leave defendant's house. Lee drove away from defendant's house and ended up having a fatal car accident not far from his own home. During the investigation of the accident scene, defendant arrived with another person, and police officers noticed defendant creating a disturbance near where other onlookers had gathered. Several of these officers testified at trial that defendant was belligerent and smelled of alcohol.

Defendant was interviewed on 2 January 2003 by an investigator with the Pitt County ABC Board of Inquiry, Calvin Craft (Investigator Craft). On 14 January 2003 defendant was also interviewed by North Carolina Highway Patrol officer David Newbie (Officer Newbie), a collision reconstructionist. Based upon seven interviews with defendant between the incident and 26 March 2003, Investigator Craft and Officer Newbie testified to written and oral statements that defendant made. These confessions,[1] are what the State relies on in proving that defendant drove a car, both while impaired and while his license was revoked.

[1] Defendant accurately points out that to survive a motion to dismiss, the State must provide some evidence in addition to defendant's statements or confession. *See State v. Trexler*, 316 N.C. 528, 531, 342 S.E.2d 878, 880 (1986). This is known as the *corpus delicti* rule, and in North Carolina there are two methods of proving the additional evidence requirement. *Id.* at 532, 342 S.E.2d at 880 (discussing both methods of proof). In *State v. Parker*, our Supreme Court "expanded" the *corpus delicti* rule in North Carolina after extensive evaluation of the rule's multiple variations. 315 N.C. 222, 337 S.E.2d 487 (1985). The more traditional application of the rule is "that there be corroborative evidence, independent of the defendant's confession, which tends to prove the commission of the crime charged." *Id.* at 229, 337 S.E.2d at 491. Another, more modern method has been called the " 'trustworthiness' version of corroboration and is generally followed by the federal courts and an increasing number of states.' " *Id.* at 230, 337 S.E.2d at 492. This method was adopted by our Supreme Court in *Parker. Id.* at 236, 337 S.E.2d at 495. *Parker* and *Trexler* offer an understanding of each method of corroboration.

---

1. "[R]egardless of whether defendant's statements constitute an actual confession or only amount to an admission, our long established rule of *corpus delicti* requires that there be corroborative evidence, independent of the statements, before defendant may be found guilty of the crime." *State v. Trexler*, 316 N.C. 528, 531, 342 S.E.2d 878, 880 (1986).

In *Trexler*, the Court explained that the traditional approach to the *corpus delicti* rule was still applicable in "cases in which there is some *evidence aliunde* the confession which, when considered with the confession, will tend to support a finding that the crime charged occurred." *Trexler*, 316 N.C. at 532, 342 S.E.2d at 880.

> The rule does not require that the *evidence aliunde* the confession prove any element of the crime. The *corpus delicti* rule only requires *evidence aliunde* the confession which, when considered with the confession, supports the confession and permits a reasonable inference that the crime occurred. . . . The independent evidence must touch or be concerned with the *corpus delicti*. . . . The expanded rule enunciated in *Parker* applies in cases in which such independent proof is lacking but where there is substantial independent evidence tending to furnish strong corroboration of essential facts contained in defendant's confession so as to establish trustworthiness of the confession.

*Id.* at 532, 342 S.E.2d at 880-81 (internal citations omitted). This rule does not require the State to come forward with evidence, absent the defendant's confession, that supports each element of the crime charged. Rather, "[a]pplying the more traditional definition of *corpus delicti*, the requirement for corroborative evidence would be met if that evidence tended to establish the essential harm, and it would not be fatal to the State's case if some elements of the crime were proved solely by the defendant's confession." *Parker*, 315 N.C. at 232, 337 S.E.2d at 493.

In *Parker*, the Court explained the modified approach, or the trustworthiness rule, as follows:

> We adopt a rule in non-capital cases that when the State relies upon the defendant's confession to obtain a conviction, it is no longer necessary that there be independent proof tending to establish the *corpus delicti* of the crime charged if the accused's confession is supported by substantial independent evidence tending to establish its trustworthiness, including facts that tend to show the defendant had the opportunity to commit the crime.

> We wish to emphasize, however, that when independent proof of loss or injury is lacking, there must be *strong* corroboration of *essential* facts and circumstances embraced in the defendant's confession. Corroboration of insignificant facts or those unrelated to the commission of the crime will not suffice. We empha-

size this point because although we have relaxed our corroboration rule somewhat, we remain advertent to the reason for its existence, that is, to protect against convictions for crimes that have not in fact occurred.

*Id.* at 236, 337 S.E.2d at 495.

Evaluating the record before us, under either the traditional or trustworthiness approach to the *corpus delicti* rule, the State offered corroborating evidence that when considered with defendant's statements is sufficient to survive defendant's motion to dismiss.

Defendant's admissions or confessions regarding driving were numerous. Sergeant Kenneth Pitts, of the North Carolina Highway Patrol, first spoke with defendant at the scene of the accident. Sergeant Pitts testified that defendant told him that he followed Lee after Lee had a phone conversation with his girlfriend. Sergeant Pitts also testified that, in his opinion, defendant was appreciably impaired during their conversation, which occurred within several hours of Lee's accident.

Investigator Craft testified that he first spoke with defendant on 2 January 2003. Defendant told him that he and Lee were first at a local restaurant where they had alcohol, then everyone went back to defendant's house where they all consumed an additional two cases of beer. Investigator Craft further testified that defendant told him he and Lee got in a brief fight on the lawn about the beer money and Lee left. Defendant went inside to get his keys, and his girlfriend "went with him" after Lee. Investigator Craft continued, stating:

That the defendant traveled toward Lee Cruz, the deceased, house and didn't see his vehicle home. He turned down a farm path and came back home; that his father came to the defendant's house. His father stated that he saw a rescue squad go by the residence that he was at, and he had a feeling that Lee was in an accident. So, they went toward Lee's house to see, and that's when they located the accident.

Investigator Craft testified that defendant told him he would issue a written statement as to what happened, and Investigator Craft received that statement the next day. After being asked by the State to read the statement into evidence, Investigator Craft testified:

This print is kind of hard to read. It says, "Lee came here after work, and asked me if I wanted to go to Mazatlan and drink and

eat, and I said 'Okay.' Lee had a girlfriend that worked at Mazatlan. I paid for my bill, and Lee paid for his. Lee had two beers and a shot, and I had the same thing. We got some beer, about two cases. We finished them and had a little argument about some beer money. We hang each other like"—I can't really see it. "We hang each like the"—then he said, "We were arguing, started crying so I let him go, and I hit the window with my fist." It's got, "Lee to his car, and I ran after him. I came in and asked my girlfriend for the keys. She said, no, because I was too drunk, and I followed minutes later. She said, 'I'll go with you,' so we left, went by Lee's house. He won't there, then we come back home and my dad picked me up and said he was leaving Jesus' home"— that's Lee's dad. "My dad was leaving Lee's dad's home. He saw an ambulance go by, so he decided to come by my home. When he got here, he said, 'Lee just' "—"He said he'd just saw an ambulance and decided to come over. I said Lee"—It looks like, "Lee after drank. Then my dad said, 'Let's go to Lee's home,' and then we saw what had happened." It's signed, "Billy Joe Cruz."

Investigator Craft spoke with defendant again on 9 January 2003, and the testimony is consistent with defendant's previous statements. Investigator Craft also testified that he spoke with defendant on 26 March 2003 and, after waiving his *Miranda* rights, defendant issued another written statement. This statement was also read into the record.

He stated, after he was advised of his Miranda rights, that his girlfriend and child were both with him while he drove his vehicle while impaired in an attempt to locate Jesus Lee Cruz; that he went to Mazatlan resteraunt because Lee wanted to drink there; that the large Hispanic female served the first beers, and the smaller one serve them the other beer, this being Ms. Portella, the smaller one of the two waitresses. He said they went to Food Lion where Juan used Lee's debit card to pay for the beer, four twelve packs. They went back to Joe's house on Green Street in Farmville where the two consumed three twelve packs of Corona beers; that they got in an argument over going to get more beer and who was going. Mr. Cruz stated that he was not going for the beer because he had too much to drink already. I advised if he knew that Lee was going to drive, and the defendant stated, "Yes." They both threw $10 on the ground for someone to go get more beer and got in the argument; that the defendant broke the window to the front door in anger and told Lee to chill out and it was

stupid to fight. Lee left fussing about his girlfriend, and the defendant went in the house to get his keys to follow Lee; that he, himself, his girlfriend and 14-month-old baby went to see if Lee was okay; that they never saw Lee's vehicle when he went to look for Lee.

Officer Newbie testified that on 14 January 2003 he spoke with defendant and defendant relayed the following:

> After this altercation [with Lee], Mr. Cruz stated he stepped inside and Lee went to his car and took off. Mr. Cruz stated that—stated that Lee's car was parked in front of his house on Green Street facing north. He last saw Lee heading north on Green Street. The defendant stated he went back inside and told his girlfriend to give him the keys. His girlfriend refused to give him the keys because he was drunk. After a few moments, his girlfriend got the baby, and they left in the car heading north on Green Street. The defendant stated when they left that—excuse me. The defendant stated that when Mr. Cruz, the deceased, left—his quote was, "When Lee left here, he was drunk; he was staggering. I know Lee. I followed Lee before home on more than three or four occasions at two or three o'clock in the morning. I get myself in trouble. I follow that man home because he drank. He won't stay the night. He wants to go home to his house." Two or three minutes after Lee left, Mr. Cruz, the defendant, left driving through Farmville at 55 to 60 and stated, "I was going passed the speed limit." The defendant stated the speed limit was 35. He went to Lee's house. The defendant went to Lee's house. He went passed Lee's house . . . . His girlfriend and the baby were in the back seat, and Mr. Cruz, the defendant, admitted he was drunk. He stated that he came through the area of the collision. . . . Mr. Cruz stated that Lee had already wrecked when he went through. Mr. Cruz, the defendant, stated that when he gets to Lee's house, he doesn't see his car, so he proceeds passed the trailer and makes a left turn onto a field path and drives over to US 264 Alternate.

Officer Newbie's testimony as to what statements defendant made are substantially similar to the testimony of Investigator Craft and Sergeant Pitts.

Thus, the essential facts of defendant's confession are that: he and Lee drank beer at a restaurant earlier in the day; the two obtained more beers and drank approximately two cases at defendant's house; Lee had talked with his girlfriend, was upset and got into a fight with

defendant before leaving; defendant, while impaired, got his keys and drove after Lee with his wife and child in the car; after passing by the accident scene close to Lee's house, defendant drove down a dirt farm road and eventually ended up at home.

The State put on evidence tending to support defendant's recitation of the events in his confession and thus lending a substantial amount of trustworthiness to his statement. First, the State called one of defendant's nephews, who testified that defendant and Lee went to the Mazatlan and drank, then purchased more beer and drank at defendant's home. Defendant's nephew testified that defendant and Lee got into an argument, but that he left defendant's house to go to the store. When he came back, approximately thirty minutes later, defendant and Lee were gone, as were both of their cars. Defendant returned to the house later on in the evening. Second, the State called a witness who was traveling on the road in the opposite direction of Lee just before Lee crashed. She stated that she saw Lee's car travel past her at a high rate of speed followed shortly thereafter by a dark colored car, also traveling very fast. After being shown a picture of defendant's car, a black Nissan, she confirmed that it was a similar car to one she saw following Lee's. Third, the State called a resident who lived near the accident site, who testified that he was in his garage and heard a speeding car go by. Then, within a few moments, he heard another car speeding towards him. He got up to look out the window and saw the car slow down, then speed up, then turn down a farm dirt road. The resident testified that the dirt road was a private road that led to 264 Alternate. Fourth, another witness testified that he was walking his dogs near the road where the accident occurred. He heard two cars coming towards the location of the accident at a high rate of speed. He said he then heard the crash, followed by another car slowing down and then speeding off. And fifth, the State called Lee's girlfriend, who testified that she called Lee twice on the day of the accident and had planned to come pick him up from defendant's house.

We determine that the State sufficiently corroborated the essential facts of defendant's confession through the testimony of these other witnesses. Several officers and witnesses testified to defendant's drinking and impairment. A car similar to the one owned and operated by defendant was seen traveling down the road near the accident and turning down a side street, just as defendant confessed to doing. The State also corroborated defendant's account of Lee receiving a phone call from his girlfriend. Absent defendant's con-

fession, the circumstantial evidence of defendant's driving would likely not be enough to support a conviction, however with his confession it is. *See Trexler*, 316 N.C. at 533-34, 342 S.E.2d at 881-82 (corroboration of defendant's admission that he drove while impaired, in conjunction with the admission itself, is enough to survive a motion to dismiss). We cannot sustain defendant's assignment of error on this point.

**[2]** Next, defendant contends the trial court erred in denying his motion to dismiss the driving while license revoked charge. We agree. Defendant argues the State presented insufficient evidence that he drove a car and that he did so with knowledge his license was revoked. As stated above, we find the evidence supporting defendant's driving to be sufficient; however, we hold there was insufficient evidence presented that defendant knew his license was revoked.

"To convict a defendant under N.C. Gen. Stat. § 20-28(a) of driving while his license is revoked the State must prove beyond a reasonable doubt (1) the defendant's operation of a motor vehicle (2) on a public highway (3) while his operator's license is revoked." *State v. Richardson*, 96 N.C. App. 270, 271, 385 S.E.2d 194, 195 (1989) (citing *State v. Atwood*, 290 N.C. 266, 271, 225 S.E.2d 543, 545 (1976)). The State must also prove "the defendant had 'actual or constructive knowledge of the . . . revocation in order for there to be a conviction under this statute.' " *Id.* This Court has previously held that "[t]he State satisfies its burden of proof of a G.S. 20-28 violation when, 'nothing else appearing, it has offered evidence of compliance with the notice requirements of G.S. 20-48 because of the presumption that he received notice and had such knowledge.' " *State v. Curtis*, 73 N.C. App. 248, 251, 326 S.E.2d 90, 92 (1985) (quoting *State v. Chester*, 30 N.C. App. 224, 227, 226 S.E.2d 524, 526 (1976)).

Section 20-48 of our General Statutes states that:

Whenever the Division is authorized or required to give any notice under this Chapter or other law regulating the operation of vehicles, unless a different method of giving such notice is otherwise expressly prescribed, such notice shall be given either by personal delivery thereof to the person to be so notified or by deposit in the United States mail of such notice in an envelope with postage prepaid, addressed to such person at his address as shown by the records of the Division. The giving of notice by mail is complete upon the expiration of four days after such deposit of such notice. *Proof of the giving of notice in either such manner*

*may be made by the certificate* of any officer or employee of the Division *or affidavit of any person* over 18 years of age, *naming the person to whom such notice was given and specifying the time, place, and manner of the giving thereof.*

N.C. Gen. Stat. § 20-48(a) (2003) (emphasis added). Accordingly, if notice of a revocation is sent via the mail, as was done in this case, there is a rebuttable presumption that defendant has received knowledge of the revocation four days after a certificate or affidavit states that a copy of an official notice has been mailed to defendant's address. *See id.; Chester*, 30 N.C. App. at 227-28, 226 S.E.2d at 526-27. When mailing notice, evidence of compliance with the statute requires the State to show an official notice explaining the date revocation will begin *and* a certificate or affidavit of a person stating the "time, place, and manner of the giving thereof." *See, e.g., State v. Herald*, 10 N.C. App. 263, 264, 178 S.E.2d 120, 121-22 (1970) (certificate of mailing complied with statutory "proof of notice" requirement); *see also State v. Curtis*, 73 N.C. App. 248, 251-52, 326 S.E.2d 90, 92-93 (1985) (defendant's stipulation of a mailing date was sufficient to show the notice was mailed to defendant).

Here, the State had a police officer testify that defendant's license was revoked as of 29 December 2002, two days before the incident. The State also introduced an official notice from the Department of Motor Vehicles addressed to defendant, stating the revocation would begin on 29 December 2002. The notice is dated 30 October 2002; however, at trial, there was no testimony, certificate, or affidavit introduced that proves the 30 October 2002 notice was ever mailed to defendant. Without any evidence that an official notice was actually mailed to defendant's address, the State falls short of offering even a *prima facie* case of knowledge, and a dismissal is appropriate. *See State v. Richardson*, 96 N.C. App. 270, 271-72, 385 S.E.2d 194, 194-95 (1989) (dismissal appropriate where the only evidence of defendant's knowledge of revocation was a police officer's testimony).

[3] Defendant also argues that the trial court erred in finding a grossly aggravating factor: that he drove impaired with a child under the age of sixteen in the car. Defendant argues this finding by the trial court, and not the jury, is in violation of *Blakely v. Washington*, 542 U.S. 296, 159 L. Ed. 2d 403 (2004). In *State v. Allen*, 359 N.C. 425, 438-39, 615 S.E.2d 256, 265 (2005), our Supreme Court applied *Blakely* and held that N.C. Gen. Stat. § 15A-1340.16 was unconstitutional to the extent that it required the trial court to find aggravating factors by a preponderance of the evidence, rather than presenting them to the

jury for a determination beyond a reasonable doubt. The remedy applied in *Allen* for this "structural error" was remand for resentencing. *Id.* at 449, 615 S.E.2d at 269. In *State v. Speight*, 359 N.C. 602, 614 S.E.2d 262 (2005), our Supreme Court determined that "the rationale in *Allen* applies to all cases in which (1) a defendant is constitutionally entitled to a jury trial, and (2) a trial court has found one or more aggravating factors and increased a defendant's sentence beyond the presumptive range without submitting the aggravating factors to a jury." *Id.* at 606, 614 S.E.2d at 264. *Speight* involved a defendant convicted of driving while impaired and sentenced as a Level II offender under N.C. Gen. Stat. § 20-179 (2003), without a jury finding the grossly aggravating factor that escalated his level of punishment. *Id.* at 604, 614 S.E.2d at 263. In accord, here we hold that the trial court's sentence of defendant as a Level II offender on the basis of *its* finding of a grossly aggravating factor was also structural error that requires resentencing. *See id.* at 606, 614 S.E.2d at 264-65.

In sum, the trustworthiness of defendant's confessions was adequately corroborated and his conviction for driving while impaired was without error. Defendant's conviction for driving while license revoked is reversed because the State failed to offer sufficient evidence of compliance with N.C. Gen. Stat. § 20-48. Further, defendant is entitled to a new sentencing hearing on the driving while impaired conviction because the grossly aggravating factor was not submitted to a jury to be determined beyond a reasonable doubt.

No error in part, reversed in part, remanded for resentencing.

Judges McGEE and CALABRIA concur.